Kelly E. Nokes
Montana Bar No. 39465862
Western Environmental Law Center
P.O. Box 218
Buena Vista, CO 81211
575-613-8051
nokes@westernlaw.org

Matthew K. Bishop
Montana Bar No. 9968
Western Environmental Law Center
103 Reeder's Alley
Helena, MT 59601
406-324-8011
bishop@westernlaw.org

*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION**

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, a non-profit organization; THE INTERNATIONAL WILDLIFE COEXISTENCE NETWORK, a non-profit organization; WILDEARTH GUARDIANS, a non-profit organization; NIMIIPUU PROTECTING THE ENVIRONMENT, a non-profit organizations; ALLIANCE FOR THE WILD ROCKIES, a non-profit organization; FRIENDS OF THE CLEARWATER, a non-profit organization, WILDERNESS WATCH, a non-profit organization; PREDATOR DEFENSE, a non-profit organization; TRAP FREE MONTANTA, a non-profit organization; and PROTECT THE WOLVES, a non-profit organization, | No.  **COMPLAINT** |

Plaintiffs,

vs.

MARTHA WILLIAMS, in her official capacity as Director of the U.S. Fish and Wildlife Service; UNITED STATES FISH AND WILDLIFE SERVICE, a federal agency; DEB HAALAND, in her official capacity as Secretary of the Interior; and the UNITED STATES DEPARTMENT OF THE INTERIOR, a federal department,

Federal-Defendants.

## INTRODUCTION

1. Plaintiffs bring this civil action against the above-named Federal Defendants (collectively, the "Service") under the citizen suit provision of the Endangered Species Act ("ESA"), 16 U.S.C. § 1540(g), and under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, for violations of the ESA.

2. This case challenges the Service's Finding for the Gray Wolf in the Northern Rocky Mountains and Western United States, 89 Fed. Reg. 8,391 (Feb. 7, 2024) (herein, "not-warranted finding" or "finding").

3. Specifically, this case challenges the Service's finding that the Western United States ("Western U.S.") gray wolf (*Canis lupus*) distinct population segment ("DPS") does not warrant listing as an endangered or threatened species under the ESA.

4. The Service prepared a gray wolf species status assessment ("SSA") in response to petitions submitted by conservation organizations requesting that ESA protections for gray

wolves in the Congressionally-created and Congressionally-delisted region of the Northern Rocky Mountains ("NRM") be reinstated, or alternatively, that gray wolves in the NRM be included in a broader, Western U.S. DPS and be afforded the full protections of the ESA.

5.  Based on the SSA, the Service issued a not-warranted finding. In short, the Service determined that while the western population of gray wolves qualified as a DPS, they did not find the Western U.S. gray wolf DPS meets the definition of threatened or endangered under the ESA. Neither the law nor the best available science supports the Service's finding.

6.  The 2024 not-warranted finding followed shortly after the Service's most recent attempt to delist all gray wolves in the lower 48 states was rejected by the courts. In *Defenders of Wildlife v. U.S. Fish & Wildlife Serv.*, 584 F. Supp. 3d 812 (N.D. Cal. 2022), the court vacated the Service's 2020 delisting rule and reinstated ESA protections for wolves outside of the NRM, finding the Service had arbitrarily rejected the importance of wolves outside of core population centers in order to delist gray wolves throughout the lower 48 states in violation of the ESA. *Id.*

7.  Plaintiffs – a coalition of conservation organizations dedicated to ensuring the survival and recovery of gray wolves and other imperiled wildlife in the Western U.S. – are thus compelled to bring this civil action. The Service's finding that gray wolves in the Western U.S. DPS do not meet the definition of threatened or endangered is arbitrary, capricious, an abuse of discretion, and not in accordance with the ESA.

## JURISDICTION

8.   This Court has jurisdiction over this action under 28 U.S.C. § 1331, 16 U.S.C. § 1540(g), and 5 U.S.C. § 704.

9.   This Court has the authority to review the Service's action(s) and/or inaction(s) complained of herein and grant the relief requested under 16 U.S.C. § 1540(g) and 5 U.S.C. § 706.

10. Plaintiffs exhausted all available administrative remedies. All requirements for judicial review required by the ESA are satisfied. Plaintiffs provided defendants a sixty-day notice of intent to sue letter in accordance with the ESA via email on February 7, 2024. Plaintiffs also sent the letter via U.S. Postal Service certified mail on February 7, 2024. These letters notified each defendant of Plaintiffs' intent to file a civil action to rectify legal violations described in the letter. More than sixty-days have elapsed since all defendants were given notice of Plaintiffs' intent to sue. Defendants acknowledged receipt of Plaintiffs' notice letter and informed Plaintiffs that they had no intention of rectifying the identified violations via a letter signed on April 1, 2024. All requirements for judicial review required by the APA are satisfied.

11. The relief sought is authorized by 28 U.S.C. § 2201, 28 U.S.C. § 2202, 16 U.S.C. § 1540, and 5 U.S.C. § 706.

12. Venue is proper in this Court under 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e).

13. Plaintiffs have organizational standing. Plaintiffs satisfy the minimum requirements for Article III standing. Plaintiffs – including their members, supporters, and staff – have suffered and continue to suffer injuries to their interests in gray wolves, gray wolf conservation, gray wolf habitat, and pursuing their interests in areas occupied by gray wolves caused by the Service's not-warranted finding. This Court can redress these injuries by granting the relief requested. There is a present and actual controversy between the parties.

## PARTIES

14. Plaintiff, WESTERN WATERSHEDS PROJECT, is a non-profit conservation organization dedicated to protecting and restoring wildlife and watersheds across the American West. Western Watershed Project is specifically committed to ensuring the survival and recovery of gray wolves. Western Watershed Project has approximately 14,000 active members and supporters across the Western U.S., including many who reside in Montana, Idaho, and Wyoming. Western Watersheds Project maintains a headquarters in Hailey, Idaho, and offices in Missoula, Montana and Boise, Idaho, where much of its work to conserve gray wolves occurs. Western Watersheds Project brings this action on behalf of itself, its members, and its supporters.

15. Plaintiff, INTERNATIONAL WILDLIFE COEXISTENCE NETWORK, is a non-profit conservation organization dedicated to providing expert interdisciplinary assistance, training, collaboration, and shared research to enable communities around the globe to coexist with wildlife. International Wildlife Coexistence Network is specifically committed

5

to ensuring the survival and recovery of gray wolves. International Wildlife Coexistence Network has approximately 80,000 active supporters across the Western U.S., including many who reside in Montana, Idaho, and Wyoming. International Wildlife Coexistence Network maintains an office in Boise, Idaho, where much of its work to conserve gray wolves occurs. International Wildlife Coexistence Network brings this action on behalf of itself, its members, and its supporters.

16. Plaintiff, WILDEARTH GUARDIANS, is a non-profit conservation organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and the health of the American West. WildEarth Guardians is specifically committed to ensuring the survival and recovery of gray wolves. WildEarth Guardians has approximately 179,000 active members and supporters across the Western U.S., including many who reside in Montana, Idaho, and Wyoming. WildEarth Guardians maintains an office in Missoula, Montana, where much of its work to conserve gray wolves occurs. WildEarth Guardians brings this action on behalf of itself, its members, and its supporters.

17. Plaintiff, NIMIIPUU PROTECTING THE ENVIRONMENT, is a non-profit conservation organization that exists to carry on time-honored sustainable environmental practices in the tradition of the Nimiipuu by facilitating and organizing tribal youth and adults in activities for the protection, enhancement, and promotion of mother earth and the Nimiipuu culture. Nimiipuu Protecting the Environment is specifically committed to ensuring the survival and recovery of gray wolves. Nimiipuu Protecting the Environment has approximately 100 active members and supporters across the Western U.S., including

many who reside in Montana and Idaho. Nimiipuu Protecting the Environment maintains an office in Moscow, Idaho, where much of its work to conserve gray wolves occurs. Nimiipuu Protecting the Environment brings this action on behalf of itself, its members, and its supporters.

18. Plaintiff, ALLIANCE FOR THE WILD ROCKIES, is a non-profit conservation organization dedicated to the protection and preservation of the native biodiversity of the Northern Rockies Bioregion, its native plant, fish, and animal life, and its naturally functioning ecosystems. Alliance for the Wild Rockies is specifically committed to ensuring the survival and recovery of gray wolves. Alliance for the Wild Rockies has approximately 2,000 active members and supporters across the Western U.S., including many who reside in Montana, Idaho, and Wyoming. Alliance for the Wild Rockies' registered office is in Missoula, Montana, where much of its work to conserve gray wolves occurs. Alliance for the Wild Rockies brings this action on behalf of itself, its members, and its supporters.

19. Plaintiff, FRIENDS OF THE CLEARWATER, is a non-profit conservation organization dedicated to protecting the ecological integrity of the public lands of Idaho's Wild Clearwater Country, which encompasses the wild breaks of the Salmon River to the headwaters of the St. Joe River, and from the peaks of the Bitterroot Range to the depths of Hells Canyon. Friends of the Clearwater is specifically committed to ensuring the survival and recovery of gray wolves. Friends of the Clearwater has approximately 900 active members and supporters across the Western U.S., including many who reside in Montana, Idaho, and Wyoming. Friends of the Clearwater maintains an office in Moscow,

Idaho, where much of its work to conserve gray wolves occurs. Friends of the Clearwater brings this action on behalf of itself, its members, and its supporters.

20. Plaintiff, WILDERNESS WATCH, is a non-profit conservation organization dedicated to the protection and proper stewardship of the National Wilderness Preservation System and the wildlife living there. Wilderness Watch is specifically committed to ensuring the survival and recovery of gray wolves. Wilderness Watch has approximately 52,000 active members and supporters across the Western U.S., including many who reside in Montana, Idaho, and Wyoming. Wilderness Watch maintains an office in Missoula, Montana, where much of its work to conserve gray wolves occurs. Wilderness Watch brings this action on behalf of itself, its members, and its supporters.

21. Plaintiff, PREDATOR DEFENSE, is a non-profit conservation organization dedicated to protecting essential native predators, teaching coexistence, and ending America's war on wildlife. Predator Defense is specifically committed to ensuring the survival and recovery of gray wolves. Predator Defense has approximately 24,000 active supporters across the Western U.S., including many who reside in Montana, Idaho, and Wyoming. Predator Defense maintains an office in Eugene, Oregon, where much of its work to conserve gray wolves occurs. Predator Defense brings this action on behalf of itself, its members, and its supporters.

22. Plaintiff, TRAP FREE MONTANA, is a non-profit conservation organization dedicated to connecting hearts and minds through science, truths in trapping, and compassion for wildlife, biodiversity, coexistence, and responsible stewardship. Trap Free

Montana is specifically committed to ensuring the survival and recovery of gray wolves. Trap Free Montana has approximately 1,500 active members and supporters across the Western U.S., including many who reside in Montana, Idaho, and Wyoming. Trap Free Montana maintains an office in Hamilton, Montana, where much of its work to conserve gray wolves occurs. Trap Free Montana brings this action on behalf of itself, its members, and its supporters.

23. Plaintiff, PROTECT THE WOLVES, is a non-profit conservation organization founded by Tribal Members that advocates for the preservation and protection of wolves and other wildlife in North America and around the world. Protect the Wolves strives to safeguard the religious beliefs of Native Americans and believes it is essential to educate the younger generation about the significance of conserving and protecting sacred wolves. Protect the Wolves is specifically committed to ensuring the survival and recovery of gray wolves. Protect the Wolves has approximately 54,000 supporters across the Western U.S., including many who reside in Montana, Idaho, and Wyoming. Protect the Wolves maintains an office in Lucerne Valley, California, where much of its work to conserve gray wolves occurs. Protect the Wolves brings this action on behalf of itself, its members, and its supporters.

24. Plaintiffs have members and supporters who have standing to pursue this civil action in their own right and their interests in gray wolves and gray wolf conservation (at stake in this case) are germane to their respective organization's purposes.

25. Plaintiffs' members, supporters, and staff are dedicated to ensuring the long-term survival and recovery of gray wolves in the Western U.S. and in ensuring the Service complies with the ESA and bases all listing decisions on the best available science.

26. Plaintiffs' members, supporters, and staff understand the importance of listing for gray wolves and what it means to gray wolf conservation in the Western U.S. Plaintiffs' members, supporters, and staff also understand the importance of complying with the law, regulations, and policy, and applying the best science when making important decisions about listing species under the ESA.

27. Plaintiffs' members, supporters, and staff live in or near and/or routinely recreate in or near areas occupied by gray wolves. Plaintiffs' members, supporters, and staff enjoy observing – or attempting to observe – and studying gray wolves, including signs of the gray wolf's presence and/or photographing gray wolves in areas where the species is known to rendezvous, travel, and occur. The opportunity to view gray wolves or signs of gray wolves in the wild by itself is of significant interest and value to Plaintiffs' members, supporters, and staff and increases their use and enjoyment of areas where gray wolves may still exist.

28. Plaintiffs' members, supporters, and staff derive aesthetic, recreational, scientific, inspirational, educational, spiritual, and other benefits from gray wolves and working to conserve gray wolves in the Western U.S. Plaintiffs' members, supporters, and staff enjoy working to protect and restore gray wolves in the Western U.S. In furtherance of these interests, Plaintiffs' members, supporters, and staff have worked and continue to work to conserve gray wolves. Ensuring the Service evaluates the ESA's threat factors, complies with

the ESA, and utilizes the best available science when making listing decisions is a key component of Plaintiffs' interests in gray wolves and gray wolf conservation.

29. The Service's not-warranted finding has harmed, is likely to harm, and will continue to harm Plaintiffs' interests in gray wolves and gray wolf conservation. Instead of finding gray wolves in the Western U.S. DPS (including gray wolves in the Congressionally-created and Congressionally-delisted NRM) are warranted for listing and then applying the additional protections and conservation measures afforded by the ESA which are designed to conserve the species (e.g., federal management authority, prohibitions on take, consultation, recovery planning, designating critical habitat, etc.) gray wolves now remain without federal protections in the Congressionally-created and Congressionally-delisted NRM. Additionally, the lack of a consistent management framework for gray wolves across the Western U.S. fails to provide for connectivity and genetic diversity, and fails to ensure that a cohesive plan that allows gray wolves to recover is being implemented. This has harmed and will continue to harm Plaintiffs' interests in gray wolves and gray wolf recovery.

30. Plaintiffs' interests have been, are being, and unless the requested relief is granted, will continue to be harmed by the Service's 2024 not-warranted finding.

31. If this Court issues the relief requested the harm to Plaintiffs' interests will be alleviated and/or lessened.

32. Federal-Defendant MARTHA WILLIAMS is sued in her official capacity as Director of the U.S. Fish and Wildlife Service. As Director, Ms. Williams is the federal official with responsibility for all Service officials' actions and/or inactions challenged in this case.

33. Federal-Defendant UNITED STATES FISH AND WILDLIFE SERVICE is an agency within the United States Department of the Interior that is responsible for applying and implementing the federal laws and regulations challenged in this case.

34. Federal-Defendant, DEB HAALAND, is sued in her official capacity as Secretary of the Interior. As Secretary, Ms. Haaland is the federal official with responsibility for all Service officials' actions and/or inactions challenged in this case.

35. Federal-Defendant, the UNITED STATES DEPARTMENT OF THE INTERIOR, is the federal department responsible for applying and implementing the federal laws and regulations challenged in this case.

## BACKGROUND

**The Gray Wolf (*Canis lupus*)**

36. Gray wolves are the largest wild members of the canid (dog) family and have a broad circumpolar range. This photo of a gray wolf was taken by the National Park Service:



37. Adult gray wolves range in weight from 40 to 175 pounds, depending on sex and geographic locale.

38. Gray wolves are highly territorial, social animals that live and hunt in packs.

39. Gray wolves are well adapted to travelling fast and far in search of food, and to catching and consuming large mammals.

40. Gray wolves in North America primarily eat mammals, including deer, elk, and other species.

41. Gray wolves successfully occupy a wide range of habitats if sufficient prey availability exists and human-caused mortality is adequately regulated. High-quality, suitable habitat generally exists in areas with sufficient prey where human-caused mortality is relatively low due to limited human access, there are high amounts of escape cover, or there is a relatively low risk of wolf-livestock conflicts.

42. Where human-caused mortality is low or nonexistent, gray wolf populations are partly influenced by the distribution and abundance of prey on the landscape. Density-dependent, intrinsic mechanisms (e.g., social strife, territoriality, and disease) may limit gray wolf populations when ungulate densities are high.

43. Gray wolf pack structure is relatively adaptable, and breeding members may be replaced from within or outside the pack, and pups may be reared by other pack members if their parents die.

44. Gray wolf dispersal capabilities allow wolf populations to expand and recolonize vacant habitats as long as rates of human-caused mortality are not excessive. The rate of

gray wolf recolonization may be impacted by the extent of intervening unoccupied habitat between the source population and areas to be recolonized.

**The Gray Wolf's Decline in the Contiguous United States**

45. Hundreds of thousands of gray wolves likely ranged across the Western U.S. and Mexico. However, the gray wolf's range and numbers declined significantly throughout the 19th and 20th centuries as the result of human-caused mortality from poisoning, trapping, and shooting, and from government-funded programs of gray wolf eradication and were extirpated in the western United States by the 1940s.

46. Historically (at the time of European settlement), the gray wolf's range included most of North America, and consequently, most of the lower 48 United States, except in the far southeastern region of the country. By 1974, the species had been eliminated from most of its historical range, and occurred only in small populations in Minnesota and on Isle Royale, Michigan.

47. Today, gray wolves exist primarily in two metapopulations: one covering the Western Great Lakes states of Minnesota, Wisconsin, and Michigan; and the other in the Congressionally-created and Congressionally-delisted Northern Rocky Mountains region of Montana, Idaho, and Wyoming ("NRM"). A small number of recolonizing gray wolves can be found in the Pacific Northwest (or "West Coast") states of Oregon, Washington, and California as well. Additionally, a small number of wolves currently reside in Colorado as the result of a recent reintroduction effort that began with the release of ten wolves in December 2023 and January 2024.

48. As of the end of 2022, states estimated that there were approximately 2,797 wolves in 286 packs across seven states. As of the end of 2022, it was estimated that there were approximately 2,682 wolves in the NRM and 115 wolves outside of the NRM.

49. As of 2022, the Service alleges there were approximately 1,087 wolves in Montana.

50. As of 2022, the Service alleges there were approximately 958 wolves in Idaho.

51. As of 2022, the Service alleges there were approximately 338 wolves in Wyoming.

52. As of 2022, the Service alleges there were approximately 178 wolves in Oregon.

53. As of 2022, the Service alleges there were approximately 216 wolves in Washington.

54. As of 2022, the Service alleges there were approximately 18 wolves in California.

55. As of 2022, the Service alleges there were approximately 2 wolves in Colorado.

56. A number of lone dispersing wolves have been documented outside of the Great Lakes and NRM metapopulations in all states within the historical range of the gray wolf west of the Mississippi River, except in Oklahoma and Texas. Since the early 2000s, individual gray wolves have been confirmed and reported in the following states: Vermont, Massachusetts, New York, Indiana, Illinois, Iowa, Missouri, North Dakota, South Dakota, Nebraska, Kansas, Colorado, Utah, Arizona, and Nevada.

57. The Service acknowledges that there are substantial areas of modeled wolf habitat in the Western U.S. that are currently unoccupied, particularly in the central and southern Rocky Mountains (i.e., Colorado and Utah) with studies indicating that these areas could potentially support 600 to 2,000 wolves combined. The Service acknowledges that

northern California, western Oregon, and western Washington also contain substantial areas of wolf habitat.

58. Although gray wolves are starting to make a comeback in select areas of the United States, the species has yet to achieve self-sustaining populations in much of their historic habitat across vast portions of the Western U.S., including in the West Coast states of Oregon, Washington, and California, and the Southern and/or Central Rocky Mountains region, including the states of Colorado, Utah, Nevada, and northern New Mexico.

**The Gray Wolf's Listing History Under the ESA**

59. Gray wolves were among the first species granted federal protections, first under the legislative predecessors to the ESA, the Endangered Species Preservation Act of 1966 and the Endangered Species Conservation Act of 1969, and subsequently under the ESA of 1973, as amended.

60. The entities listed in the 1978 gray wolf listing rule included: (1) an endangered population at the taxonomic species level (*C. lupus*) throughout the contiguous United States and Mexico; and (2) a threatened population in Minnesota.

61. At the time of the 1978 listing, human-caused mortality was identified as a primary threat to the species.

62. At the time of the 1978 listing, there were approximately 1,235 wolves in Minnesota remaining.

63. The Service has made multiple failed attempts to remove gray wolves from the list of threatened and endangered wildlife.

64. In 2003, the Service attempted to designate three separate DPSs of gray wolves and reclassify their status. 68 Fed. Reg. 15,804 (April 1, 2003). The 2003 rule designated an Eastern DPS and reclassified it as threatened under the ESA. The 2003 rule designated a Western DPS and reclassified it as threatened under the ESA. The 2003 rule designated a Southwestern United States and Mexico DPS and reclassified it as endangered under the ESA. The 2003 rule delisted the gray wolf in unoccupied non-historical range.

65. The 2003 rule was vacated in both *Defenders of Wildlife v. Secretary, U.S. Dep't of the Interior*, 354 F.Supp.2d 1156 (D. Or. 2005) ("*Oregon Wolves*"), and in *Nat'l Wildlife Fed'n v. Norton*, 386 F.Supp.2d 553 (D. Vt. 2005) ("*Vermont Wolves*").

66. In *Oregon Wolves*, the court held that the Service: (1) arbitrarily and capriciously failed to properly analyze whether the gray wolf was endangered or threatened in a "significant portion of its range" by failing to consider that "a species can be extinct throughout a significant portion of its range if there are major geographical areas in which it is no longer viable but once was," 354 F.Supp.2d at 1167–68; (2) arbitrarily and capriciously applied its DPS policy to "expand the boundaries" of its proposed DPSs, which effectively decreased protections for the species outside of core recovery areas despite the fact that existing threats continue unabated, 354 F.Supp.2d at 1171; and (3) arbitrarily and capriciously failed to consider the attempt to down-list the species in vast portions of its geographic range without apply the ESA section 4(a) threat factors, 354 F.Supp.2d at 1172. As summarized by a federal appellate court later addressing the case, the *Oregon Wolves* court held that "by downlisting the species based solely on the viability of a small

17

population within that segment, the Service was effectively ignoring the species' status in its full range, as the [ESA] requires." *Humane Soc'y of the United States v. Zinke*, 865 F. 3d 585, 592 (D.C. Cir. 2017).

67. In *Vermont Wolves*, the court held that the Service "cannot downlist an area that it previously determined warrants an endangered listing because it 'lumps together' a core population with a low to non-existent population outside of the core area." 386 F.Supp.2d at 565. The *Vermont Wolves* court held that the Service "bypass[es] application of the ESA in the non-core area" when it arbitrarily "expands the boundaries" of the wolf population to achieve its desired outcome to lessen federal protections for the species. 386 F.Supp.2d at 565. The *Vermont Wolves* court held that a final rule "that makes all other portions of the wolf's historical or current range outside of the core gray wolf populations insignificant and unworthy of protection" is "contrary to the plain meaning of the ESA phrase 'significant portion of its range,' and therefore is an arbitrary and capricious application of the ESA." 386 F.Supp.2d at 566.

68. In 2007, the Service attempted to designate a Western Great Lakes DPS and remove it from the list of endangered and threatened wildlife. 72 Fed. Reg. 6,052 (Feb. 8, 2007).

69. The 2007 rule was vacated in *Humane Soc'y of the United States v. Kempthorne*, 579 F. 2d 7 (D.D.C. 2008).

70. In 2008, the Service attempted to designate a NRM DPS and remove it from the list of endangered and threatened wildlife. 73 Fed. Reg. 75,356 (Feb. 27, 2008).

71. The 2008 rule was enjoined in *Defenders of Wildlife v. Hall*, 565 F. Supp. 2d 1160 (D. Mont. 2008), and subsequently vacated and remanded.

72. In 2009, the Service attempted to designate a Western Great Lakes DPS and remove it from the list of endangered and threatened wildlife. 74 Fed. Reg. 15,070 (Apr. 2, 2009). In 2009, the Service attempted to designate a NRM (except Wyoming) DPS and remove it from the list of endangered and threatened wildlife. 74 Fed. Reg. 15,123 (Apr. 2, 2009).

73. The 2009 Western Great Lakes DPS rule was vacated by *Humane Soc'y of the United States v. Salazar*, 1:09-CV-1092-PLF (D.D.C. 2009) (case settled). The 2009 NRM (except Wyoming) DPS rule was vacated by *Defenders of Wildlife v. Salazar*, 729 F.Supp.2d 1207 (D. Mont. 2010).

74. In 2011, Congress forced the Service to reissue the 2009 NRM (except Wyoming) rule designating a DPS and removing it from the list of endangered and threatened wildlife in Public Law 112-10, The Department of Defense and Full-Year Continuing Appropriations Act.

75. In 2011, the Service again attempted to designate a Western Great Lakes DPS and remove it from the list of endangered and threatened species. 76 Fed. Reg. 81,666 (Dec. 28, 2011).

76. The 2011 Western Great Lakes rule was vacated by *Humane Soc'y of the United States v. Jewell*, 76 F. Supp. 69, 110 (D.D.C. 2014). The vacatur of the 2011 Western Great Lakes rule was upheld on appeal by *Humane Soc'y of the United States v. Zinke*, 865 F. 3d 858 (D.C. Cir. 2017).

77. In *Humane Soc'y of the United States v. Zinke*, the court held that the Service failed to consider two significant aspects in its 2011 Western Great Lakes rule: (1) the impacts of partial delisting on the remnant population, and (2) the impacts of historical range loss on the already-listed species. 865 F.3d at 585.

78. In 2012, the Service attempted to remove gray wolves in Wyoming from the list of endangered and threatened species. 77 Fed. Reg. 55,530 (Sept. 10, 2012).

79. The 2012 Wyoming rule was vacated in *Defenders of Wildlife v. Jewell*, 68 F. Supp. 3d 193 (D.D.C. 2014). The vacatur of the 2012 Wyoming rule was reversed on appeal in *Defenders of Wildlife v. Zinke*, 849 F.3d 1077 (D.C. Cir. 2017). The 2012 Wyoming rule was reinstated in 2017. 82 Fed. Reg. 20,284 (May 1, 2017).

80. In 2020, the Service attempted to delist gray wolves in the coterminous United States by lumping together the Minnesota and contiguous United States and Mexico populations (excepting the Mexican wolf and red wolf subspecies populations, as well as the already Congressionally-created and Congressionally-delisted NRM population) into a singular "gray wolf entity." 85 Fed. Reg. 69,778 (Nov. 3, 2020).

81. The 2020 rule was vacated by *Defenders of Wildlife v. U.S. Fish & Wildlife Serv.*, 584 F. Supp. 3d 812 (N.D. Cal. 2022). In *Defenders of Wildlife v. U.S. Fish & Wildlife Serv.*, the court held that the Service failed to consider threats to wolves outside of core populations of gray wolves in the Great Lakes states and NRM. *Id.* at 823–25. The court stated that while the Service had "changed its tactic since *Humane Society*," its "flaw is the same" – the failure to

address the status of wolves outside of core populations under the statutory listing criteria violates the ESA. *Id.* at 825.

82. Currently wolves remain listed throughout the coterminous United States, except in the Congressionally-created and Congressionally-delisted NRM.

83. In the 2009 NRM delisting rule that was reissued by Congress in 2011, the Service stated that there were three scenarios that could lead to initiation of a status review and analysis of threats to determine if relisting is warranted: (1) if the population falls below the minimum NRM recovery level of ten breeding pairs of wolves and 100 wolves in either Montana or Idaho at the end of the year; (2) if the population segment in Montana or Idaho falls below 15 breeding pairs or 150 wolves at the end of the year in any one of those states for three consecutive years; or (3) if a change in state law or management objectives would significantly increase the threat to the wolf population.

**State Management of Gray Wolves**

84. In states where wolves are currently federally protected under the ESA, state management frameworks generally exist.

85. In Colorado, wolves are managed as an experimental population under Section 10(j) of the ESA. In Colorado, the state uses a 2023 state management plan to guide management of wolves in the state. In Colorado, lethal control may be authorized under the Section 10(j) rule that applies to wolves that have been reintroduced into the state. In Colorado, a regulated public harvest of wolves could be allowed if the species is federally delisted.

86. In California, the state uses a 2016 state management plan to guide management of wolves in the state. In California, lethal control of gray wolves could be allowed if the species is federally delisted.

87. In Nevada, the Service alleges gray wolves have always been scarce. In late-March 2024, a pack of wolves was documented in Nevada for the first time in nearly 100 years.

88. Because gray wolves are delisted in the Congressionally-created and Congressionally-delisted NRM, the states – not the Service – have management authority of over gray wolves within their respective jurisdictions.

89. The states have management authority over gray wolves in Montana, Idaho, and Wyoming, as well as in the eastern one-third of the states of Oregon and Washington, and a small portion of Utah (which constitute the boundaries of the Congressionally-created and Congressionally-delisted NRM).

90. In Utah, wolves are federally delisted as part of the Congressionally-created and Congressionally-delisted NRM in a small portion of the north-central part of the state. Elsewhere in Utah, wolves are federally listed under the ESA. In Utah, a 2005 state management plan guides wolf management in the state. In Utah, in 2010, the legislature passed SB 36, which prevents the establishment of a viable pack of gray wolves in the delisted portion of the state until wolves are federally delisted statewide. Utah Code 23-29-201. In Utah, wolves may be aggressively managed in the delisted portion of the state if documented. In Utah, a Section 10(a)(1)(A) permit provides the authority for any wolves

that travel into the state from Colorado, New Mexico, or Arizona to be captured and transported out of the state.

91. In the western two-thirds of Oregon, wolves are listed by the Service as endangered. In the eastern one-third of Oregon, wolves have been delisted and no longer benefit from the protections of the federal ESA. In Oregon, the state uses a 2019 state plan and wildlife policy to guide long-term management of wolves. In Oregon, lethal control may be authorized where the species is not federally listed. In Oregon, 86 wolves were killed from 2009 to 2022, including 8 killed by poison in 2021.

92. In the western two-thirds of Washington, wolves are listed by the Service as endangered. In the eastern one-third of Washington, wolves have been delisted and no longer benefit from the protections of the federal ESA. In Washington, the state uses a 2011 state management plan to guide management of wolves in the state. In Washington, lethal control may be authorized where the species is not federally listed.

93. Changes in recent years to state management of gray wolves in Idaho, Montana and Wyoming have significantly increased the threats to wolves.

94. Since 2011, the states of Montana, Idaho, and Wyoming have used an adaptive management approach to manage wolves with the objective of decreasing populations. The primary method to achieve population objectives is through regulated public hunting and trapping.

95. In Wyoming, wolves are classified as a trophy game animal in the northwest part of the state, and as a predatory animal elsewhere in the state.

96. In Wyoming, wolves are classified as a "predatory animal" throughout 85 percent of the state and may be shot and killed on-sight without bag limits, hunting license requirements, or limits on the method of take. In Wyoming, where wolves are managed as a predatory animal, they may be taken by any legal means year-round and without limit.

97. In Wyoming, from 2017 to 2022, an average of 28 wolves per year were reported to have been killed in the "predatory animal" zone.

98. The Service acknowledges that wolf packs are unlikely to persist in the long-term in portions of Wyoming where wolves are classified as a predatory animal.

99. In 2021, the state legislatures in Montana and Idaho each passed legislation intended to decrease the size of the wolf populations in their states. These new regulations allow for extension of hunting season lengths, increase or remove bag limits, legalize new killing methods, and include additional opportunities for reimbursement of legal killing of wolves. In Idaho and Montana, hunters and trappers can request "reimbursement" for expenses, including truck or ATV, firearm, and clothing purchases associated with the killing of wolves by reporting their wolf kills and submitting receipts to the state department of fish and game in Idaho, or to the outside organization funding the reimbursements in Montana.

100.    The Service acknowledged that "[w]hile harvest rates documented in Idaho and Montana during the 2021-2022 and 2022-2023 wolf seasons are within the range of harvest rates that occurred during seasons that pre-dated these new laws … it remains

unclear how recent statutory and regulatory changes will affect wolf abundance and distribution in each state and throughout the West in the long-term."

101.    In Montana, gray wolves are classified as a "species in need of management." Under this classification, some of the statutory protections afforded to other species classified as game animals do not apply (i.e., the use of radio-tracking or telemetry devices to kill wolves is allowed).

102.    In Montana, a 2003 state management plan has been used to guide wolf management in the state. In October 2023, the state released a draft 2023 state management plan for guiding wolf management in the state. The Service relied on the 2023 draft plan as the most recent information indicating how Montana intends to manage wolves in the future.

103.    Montana's 2023 draft plan's objectives are to (1) maintain a viable and connected wolf population in Montana; (2) maintain authority for the state of Montana to manage wolves; (3) maintain positive and effective working relationships with stakeholders; (4) reduce wolf impacts on livestock and big game populations; (5) maintain sustainable hunter opportunities for wolves; (6) maintain sustainable hunter opportunities for ungulates; (7) increase broad public acceptance of sustainable harvest and hunter opportunities as part of wolf conservation; (8) enhance open and effective communication to better inform decisions; and (9) learn and improve over time.

104.    In Montana, the 2023 draft plan contains a 450-wolf population "benchmark."

105.     In Montana, public hunting of wolves has generally been permitted since 2009. In Montana, wolf hunting regulations have become less restrictive over time. Starting in 2021-2022, the state has allowed an outside organization to reimburse individual hunters and trappers for costs associated with legal wolf killing.

106.     In Montana, in 2012-2013, trapping was added as a legal method of take of wolves, hunting seasons were extended, and statewide harvest limits were removed. In Montana, in 2013-2014, the maximum number of wolves hunters or trappers could possess (the bag/harvest limit) was increased.

107.     In Montana, in the 2021 legislative session, a variety of bills were introduced and codified into law impacting wolf management in the state (i.e., HB 224, HB 225, SB 267, and SB 314).

108.     In Montana, in April 2021 the following regulatory changes were signed into state law intending to increase harvest opportunity and reduce wolf abundance in the state: (1) MCA 87-1-901, authorizing the use of snares to take wolves by licensed trappers; (2) MCA 87-1-304, granting the Fish and Wildlife Commission authority to extend trapping season dates; (3) MCA 87-6-214, authorizing reimbursement of costs incurred to kill wolves in Montana; and (4) MCA 87-1-901, allowing the Fish and Wildlife Commission discretion to eliminate bag limits to instead allow unlimited take on a single hunting license, authorize the use of bait to hunt wolves, and allow hunting of wolves at night on private property. Additionally, MCA 87-6-214 allows the Foundation for Wildlife Management, an outside organization that reimburses hunters for expenses for killing wolves, to legally

function in the state. These reimbursable expenses include things such as the purchase of trucks, ATVs, clothing, firearms, etc. used in the killing of wolves.

109.     In Montana, the state intends to manage for a population of 450 wolves.

110.     In Montana, between 2012 and 2020, an average of 245 wolves were killed per wolf hunting season.

111.     In Montana, there has been a general upward trend in total hunting and trapping mortality documented that was driven primarily by increased trapper kills.

112.     In Montana, in the 2020-2021 wolf hunting season, 327 wolves were killed (169 by hunters and 158 by trappers).

113.     In Montana, in the 2021-2022 wolf hunting season, 273 wolves were killed (148 by hunters, 3 of which were killed at night; 125 by trappers, 20 of which were killed by snares).

114.     In Montana, in the 2022-2023 wolf hunting season, 258 wolves were killed (121 by hunters, 1 of which was killed at night; 137 by trappers, 12 of which were killed by snares).

115.     In Montana, after the new regulatory scheme went into effect, wolves that primarily reside in Yellowstone National Park were killed. Twenty-four wolves that primarily reside in Yellowstone National Park were legally killed outside of the Yellowstone National Park boundaries in 2021-2022 (19 were killed in Montana, 2 were killed in Idaho, and 3 were killed in Wyoming). The Service stated that it is unclear how continued killing of wolves that live primarily in Yellowstone National Park might affect Yellowstone

National Park's wolf population, including: the long-term abundance, pack social structure, reproduction, pack interactions, and interactions with prey. Cassidy et al. (2023) recently found that the legal hunting of wolves outside of Yellowstone National Park is killing enough wolves to disrupt pack social structure and cause dissolution of packs in Yellowstone National Park.

116.    In Montana, since 2020, the state has used an integrated patch occupancy model (iPOM) for estimating wolf abundance in the state. iPOM incorporates an occupancy, territory, and group size model to estimate annual wolf occupancy and abundance in Montana based primarily on accounts from hunters and agency officials of wolf biology and behavior rather than intensive field monitoring. iPOM estimates may not be appropriate for estimating abundance and developing management strategies at a smaller spatial scale (such as in specific hunting management areas adjacent to Yellowstone National Park). The Service stated iPOM estimates of wolf abundance are higher than those of other patch occupancy models because it considers spatial-temporal dynamics of wolf behavior.

117.    Crabtree et al. (2023) has recently explained that Montana's iPOM estimates are biased and fundamentally flawed. Crabtree et al. (2023) explains how the spatial scale of Montana's iPOM, which is quite large, biases the population estimates in Montana that are based on the iPOM estimator. Crabtree et al. (2023) explains how biases underlying Montana's iPOM estimate can lead to misapplication and underreporting of the model's

estimate of variance, which can result in a precariously misleading situation for decision-makers that can threaten gray wolf populations.

118.    Creel (2021) has recently explained that Montana's iPOM estimates are biased and result in population estimation errors. Creel (2021) explains that because Montana's iPOM estimator underestimates territory size, its results overestimate the number of packs that occupy a fixed area, and thus overestimate population size.

119.    In Montana, the gray wolf population declined by at least 33 wolves between 2020 and 2021. In Montana, the gray wolf population declined by at least 56 wolves between 2021 and 2022. In Montana, consistent with recent statutes and state objectives, the year-end population estimates have decreased since 2020.

120.    In Idaho, since federal delisting, wolves are classified and managed as a big game species, which allows for controlled take.

121.    In Idaho, wolves were managed under a 2002 state management plan, but are now managed under a revised, 2023 state management plan.

122.    In Idaho, the goals of the 2023 state management plan for wolves are: (1) manage for a viable wolf population that fluctuates around 500 wolves annually (between 350-650 wolves depending on time of year); (2) monitor wolf population dynamics annually and continue to improve wolf monitoring and population abundance estimation methods; (3) reduce wolf depredations on livestock; and (4) reduce wolf depredations on ungulate populations not meeting population objectives.

123.    In Idaho, the state intends to achieve the 2023 state management plan's goals by increasing wolf mortality in the state to reduce the wolf population so that the population fluctuates around an average of 500 wolves by the end of 2028.

124.    In Idaho, public hunting and trapping are the primary methods employed to achieve the state's wolf population objective.

125.    In Idaho, over time, the state has gradually implemented less-restrictive hunting regulations in an attempt to reverse wolf population growth and manage wolves at a lower population size in the state.

126.    In Idaho's 2021 legislative session, the legislature passed SB 1211, which guides wolf management in Idaho. SB 1211 amended the Idaho state codes to: (1) authorize a year-round trapping season on private property (IC 36-201(3)); (2) authorize additional methods of take previously prohibited (IC 36-201(2) (i.e., no weapons restrictions, use of bait on private property, night take, no vehicle restrictions, use of dogs to pursue wolves); (3) remove any limit on the number of wolf tags an individual may purchase (IC 36-408(1)); (4) allow livestock or domestic animal owners to use private contractor to control wolves (IC 36-1107(c)); (5) allow the Idaho depredation control board to enter agreements with private contractors and state or federal agencies to implement provisions of SB 1211; and (6) provide funding for wolf control.

127.    In Idaho, since 2012, an outside organization – the Foundation for Wildlife Management – has been authorized to reimburse individual hunters and trappers for costs

associated with legal wolf harvest. The state's Fish and Game Commission has contributed state funding to finance these reimbursements.

128.     In Idaho, between the 2012-2013 and 2018-2019 wolf hunting seasons, wolf harvest fluctuated between 231 and 333 wolves killed per season.

129.     In Idaho, there was a sharp increase in the number of wolves killed – 462 – during the 2019-2020 wolf hunting season.

130.     In Idaho, 411 wolves were killed during the 2020-2021 hunting season. In Idaho, 412 wolves were killed during the 2021-2022 season.

131.     In Idaho, at the beginning of the 2022-2023 season, 388 wolves had been killed.

132.     In Idaho, between 2011 and 2022, an average of 60 wolves were removed annually in response to conflicts with livestock.

133.     The Service stated that in Idaho, the gray wolf population declined by at least 44 wolves between 2020 and 2021. The Service stated that in Idaho, the gray wolf population declined by at least 86 wolves between 2021 and 2022. As reported by Idaho Department of Fish and Game in an article dated January 27, 2023: "Idaho's 2022 population estimate of 1,337 wolves declined by about 13%, or 206 wolves, compared with the 2021 estimate based on camera surveys that measure the population during summer near its annual peak."

134.     In Idaho, days-old wolf pups weighing as little as three pounds have been killed in accordance with the state's management regime.

135.    In Idaho, since 2019, wolf abundance has been estimated using a space-to-event ("STE") modeling framework, which generally uses cameras to count the number of wolf detections and then that number is used to estimate the number of wolves across the state. STE models rely on various assumptions including that cameras capturing presence are placed randomly, each observation is independent of another, and all animals within the viewshed of the camera are photographed. Idaho currently places their cameras for the STE model non-randomly in order to enhance the likelihood of detection, which is a violation of the STE assumptions. Idaho uses motion-triggered cameras instead of time-lapse cameras, which also adds bias. It is not known how well estimates from Idaho's STE model compares to the true number of wolves in the state.

136.    Creel (2021) has recently explained that Idaho's STE estimates are biased and result in population estimation errors. Creel (2021) explains that if an STE model is to produce an accurate estimate of population size, the times and places at which cameras sample an area must be independent of the locations of animals. Creel (2021) explains that random placement of cameras is required for valid population estimates from an STE model. Creel (2021) explains that an STE model is designed for use with time-lapse camera traps that are set to take photographs at fixed times, and not for data from cameras that are triggered by animal motion. Creel (2021) explains that Idaho's STE model fails to abide by fundamental assumptions that are necessary for the model to function as an accurate estimator of the gray wolf population in Idaho.

137.    In Idaho, between 2019-2022, human-caused mortality annually removed approximately 32 percent of the state-estimated year-end wolf population, with regulated public harvest and lethal control of depredating wolves accounting for the majority of known human-caused mortality and total wolf mortalities.

138.    The Service stated that there is some concern that estimated abundance from unmarked populations in Montana and Idaho may be biased and acknowledges that it has been suggested that direct monitoring of wolves, rather than the methods currently employed by these states, may be necessary to produce reliable estimates of abundance (i.e., Creel (2022)).

139.    The Service has acknowledged that when model assumptions (such as random camera placement for the STE model) are violated, results can be biased.

140.    The Service acknowledged that neither a rigorous quantification of bias in the models used by Montana and Idaho, nor in the wolf abundance estimates Montana and Idaho have produced, have been conducted.

141.    The Service has acknowledged that it has received detailed assessments of the assumptions Montana and Idaho may be violating in their use of the iPOM and STE monitoring techniques and that these violations of assumptions may result in biased estimates (i.e., Creel (2022), Treves (2022)).

142.    The Service has stated that the best available science does not allow it to determine if correcting the estimates of wolf abundance from Montana and Idaho above or below their current values is appropriate, nor does it provide a clear correction factor.

143.    Crabtree et al. (2023) analyzed the iPOM model in Montana and provided specific correction factors for this population estimation model.

144.    In a press release announcing the not-warranted finding, the Service stated: "The states of Montana and Idaho recently adopted laws and regulations designed to substantially reduce the gray wolf populations in their states using means and measures that are at odds with modern professional wildlife management."

**Petitions to Relist Gray Wolves in the NRM, or Alternatively, List the Gray Wolf in a Western U.S. DPS**

145.    Because of the alarming new pressures on wolves from state management in Montana, Idaho, and Wyoming, in particular, in July 2021, Western Watersheds Project and 70 other conservation and animal welfare groups petitioned the Service to list a Western U.S. DPS of gray wolves under the ESA, or alternatively, to relist the Congressionally-created and Congressionally-delisted NRM DPS under the ESA.

146.    In the 2021 petition, petitioners alleged that the recent regulatory changes in Montana and Idaho, as well as Wyoming's continuation of inadequate regulatory changes, warranted relisting of the NRM wolf population under the ESA. In the 2021 petition, petitioners alleged that the wolf management plans in Montana, Idaho, and Wyoming fail to provide for genetic exchange and fail to account for unreported and super-additive mortality.

147.    In September 2021, the Service issued a positive 90-day finding on the petition. 86 Fed. Reg. 51,857–59 (Sept. 17, 2021).

148.     The Service also issued a positive 90-day finding on a separate petition to relist wolves in the NRM on an emergency basis under the ESA submitted by the Center for Biological Diversity and Humane Society of the United States. *Id.*

149.     The Service found that both petitions presented substantial information and that listing of gray wolves in a Western U.S. DPS or the NRM "may be warranted." *Id.*

150.     The Service then issued a status review of the species. *Id.*

151.     Although the ESA required the Service to issue a finding that the petitioned listings were "warranted," "not warranted," or "warranted but precluded," within 12-months of receiving the first listing petition, 16 U.S.C. § 1533(b)(3)(B), the agency did not. The Center for Biological Diversity and Humane Society of the United States petitioners filed suit against the Service, and the parties settled for a deadline for the required finding by February 2, 2024.

**The Service's Not-Warranted Finding**

152.     On February 7, 2024, the Service published its finding for the gray wolf in the NRM and Western U.S., 89 Fed. Reg. 8,391.

153.     The Service acknowledges that, in general, to maintain populations in the wild over time, wolves in the Western U.S. need well-connected and genetically diverse subpopulations that function as a metapopulation distributed across enough of their range to be able to withstand stochastic events, rebound after catastrophes (e.g., severe disease outbreaks), and adapt to changing environmental conditions.

154.     During consideration of the petition for listing, the Service conducted a DPS analysis. The Service applied its DPS Policy, 61 Fed. Reg. 4,722, which requires the Service to analyze (1) the discreteness of the population segment in relation to the remainder of the species to which it belongs; (2) the significance of the population segment to the species to which it belongs; and (3) the population segment's conservation status in relation to the Act's standards for listing, delisting, and reclassification. If the population segment is both discrete and significant, then the Service considers whether listing may be warranted.

155.     The Service analyzes the discreteness factor of its DPS analysis by considering whether the population segment is (1) markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors; or (2) delimited by international governmental boundaries within which significant differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist that are significant in light of Section 4(a)(1)(D).

156.     The Service analyzes the significance factor of its DPS analysis by considering (1) the persistence of the discrete population segment in an ecological setting that is unusual or unique for the taxon; (2) evidence that the loss of the discrete population segment would result in a significant gap in the range of the taxon; (3) evidence that the population segment represents the only surviving natural occurrence of a taxon that may be more abundant elsewhere as an introduced population outside of its historic range; or (4) evidence that the discrete population segment differs markedly from the remainder of the species in its genetic characteristics.

157.    In its not-warranted finding, the Service found the NRM is no longer a valid DPS. The Service found the NRM is no longer discrete from wolves in the remainder of the Western U.S. The Service found that the best available science supports its prior, 2013 finding that the NRM is not markedly separated from other populations of gray wolves in the Western U.S. The Service found that because the NRM is not discrete, it did not need to evaluate its significance to the taxon.

158.    In its not-warranted finding, the Service found that the Western U.S. gray wolf population qualifies as a DPS. The Service found that the Western U.S. gray wolf population is discrete because (1) it is markedly separated from the gray wolf population in the Great Lakes due to physical and genetic factors; (2) it is markedly separated from "coastal wolves" in British Columbia, Canada and Alaska due to physical and genetic factors; and (3) there are sufficient cross-border differences in exploitation and regulatory mechanisms between the United States and Canada. The Service found that the Western U.S. gray wolf is significant biologically and ecologically in relation to the larger taxon to which it belongs because the loss of the Western U.S. gray wolf population would result in a significant gap in the range of the taxon.

159.    The Service did not delineate the precise geographic boundaries of the Western U.S. DPS in its not-warranted finding.

160.    The Service published a SSA report, which serves as the scientific foundation for its not-warranted finding.

161.    The Service's not-warranted finding states that the primary stressors with the potential to affect the gray wolf's biological status include human-caused mortality, disease and parasites, and inbreeding depression.

162.    The Service's not-warranted finding states repeatedly that the primary stressor impacting the Western U.S. gray wolf is human-caused mortality, a stressor that was identified as a threat when the species was originally listed.

163.    The Service acknowledges that in the absence of high levels of human-caused mortality, wolf demographic rates are shaped by availability of food resources in combination with wolf density, pack size, and pack composition.

164.    The Service states that the main sources of human-caused mortality impacting the Western U.S. gray wolf are regulated harvest in Idaho, Montana, Washington, and Wyoming; lethal control of wolves depredating livestock throughout the NRM where wolves are federally delisted; and illegal take throughout the range of the gray wolf metapopulation in the Western U.S.

165.    The Service acknowledges that human-caused mortality is the primary cause of mortality of wolves, and that human-caused mortality is estimated to account for 60-80 percent of all wolf mortalities in the conterminous United States.

166.    The Service acknowledges that the regulation of human-caused mortality is the primary reason that the number and range of wolves has increased and expanded since the mid- to late-1970s and that the future conservation of a delisted wolf population in the NRM depends almost entirely on states' regulation of human-caused mortality.

167.     The Service states that it believes, as a general rule of thumb, wolves are able to compensate for annual rates of human-caused mortality up to approximately 29 percent of the known or estimated population.

168.     The Service stated that increased levels of human-caused mortality may decrease wolf dispersal rates, for example, if killing is significant it may lead to an overall decline in dispersal events. This decline would be due to a reduction in the number of individuals dispersing, by causing reduced competition for resources so there is less incentive to disperse, or through the direct removal of dispersing wolves. The Service stated that increased levels of human-caused mortality may affect wolves' social structure. Cassidy et al. (2023) found that the loss of wolves killed by hunting can disrupt the social structure of packs, in some cases leading to pack dissolution.

169.     The Service developed a density-dependent population growth model to project future population sizes in Montana, Idaho, Wyoming, Oregon, and Washington as part of its species status review. The Service's model projected population sizes in these states from 2022 into 100 years in the future.

170.     The Service's population model projected median population size for the entirety of Montana, Idaho, Wyoming, Oregon, and Washington in 100 years ranged from 935 for the most impactful combination of disease and harvest scenarios to 2,161 for the least impactful combination of disease and harvest scenarios.

171.    The Service's population model projected population size for the entirety of Montana, Idaho, Wyoming, Oregon, and Washington in the next ten years will be at least 753 wolves.

172.    The Service's population model results project that the number of wolves in Montana and Idaho will decline in the future.

173.    The Service's population model results are contingent on the states of Idaho, Montana, and Wyoming ceasing killing of wolves if populations decline to 150 wolves in each state.

174.    The Service's population model projections display a wide range of outcomes for future population size and the primary stressor, human-caused mortality, is one for which adaptation is unlikely. Human-caused mortality must be kept within the limits described in the population model's harvest scenarios for the model to be accurate.

175.    The Service stated that "[s]ignificant deviations from the mortality rates we analyzed, or violations of other model assumptions, could alter our confidence in [the future conditions] conclusion."

176.    The Service stated that it considered connectivity and genetic diversity in reaching its not-warranted finding. The Service stated that it considered effective population size, which essentially reflects the number of breeders in the population.

177.    In assessing genetic diversity, the Service referred to Franklin (1980) and the "50/500 rule," which states an effective population size of at least 50 individuals is needed for an isolated population to avoid inbreeding depression in the short term while an

40

effective population size of 500 individuals is needed for an isolated population to retain sufficient evolutionary genetic potential in the long term. The Service acknowledged that more recently, other authors have recommended effective population sizes of at least 100/1,000 as more appropriate general targets, but that species-specific analyses of population viability are preferred when data is available (Frankham et al. (2014)).

178.    The Service acknowledged that despite their generalized nature, these guidelines highlight that genetic diversity is critical both in the short term, to avoid inbreeding and inbreeding depression, as well as in the long term as the foundation upon which natural selection may act for adaptation.

179.    The Service stated an effective population size of 50 wolves equates to a census population size between 192 and 417 wolves, based on the 95 percent confidence interval for the effective to census population size ratio. The Service stated an effective population size of 500 wolves  equates to a census size between approximately 1,923 and 4,167 wolves. vonHoldt (2023) disputes the Service's use of these effective population size figures.

180.    vonHoldt (2023) has recently explained that the effective population size estimates for gray wolves in North America are on average 5.2 to 9.3 percent of census estimates for this species. vonHoldt (2023) has recently explained that while gray wolves may fall above minimum effective population sizes needed to avoid extinction due to inbreeding depression in the short term, they are below sizes predicted to be necessary to avoid long-term risk of extinction. vonHoldt (2023) has recently explained that the 2021

NRM gray wolf population's census size estimate of 3,354 translates into an effective

population size ranging from 201 to 335 wolves and that larger wolf populations are

necessary to ensure long term adaptation and survival.

181.     The Service acknowledged that long-term population viability in the NRM

and in the Western U.S. is dependent on maintaining a minimum number of wolves in

multiple core areas.

182.     The Service's not-warranted finding applied a quasi-extinction threshold of

five wolves for the entire Western U.S. The Service acknowledged that Washington state

recently applied a quasi-extinction threshold of 92 wolves in assessing the population

viability of wolves in that state alone.

183.     The Service's not-warranted finding does not include a minimum viable

population ("MVP") because it stated that MVPs require normative (values-based) decisions

around acceptable levels of risk.

184.     The Service's not-warranted finding determined that the impacts from

human-caused mortality, disease and parasites, and genetic diversity and inbreeding are not

of sufficient imminence, intensity or magnitude to indicate the gray wolf in the Western

U.S. is in danger of extinction or likely to become so in the foreseeable future throughout

all of its range.

185.     The Service's not-warranted finding concluded that gray wolves in the

Western U.S. are not in danger of extinction or likely to become so in the foreseeable

future despite threats from human-caused mortality, disease and predation, and genetic

diversity and inbreeding. The Service concluded the combined management and regulatory frameworks in the states of Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington and Wyoming are adequate to ensure that human-caused mortality, where it occurs, is sufficiently minimized.

186.    The Service's not-warranted finding acknowledges that its decision considers only one full harvest season with the new, less-restrictive Montana and Idaho harvest regulations in effect. The Service's finding acknowledges that existing management plans currently allow the states of Montana and Idaho to increase harvest opportunities in an effort to reduce the size of the wolf populations in their states.

187.    The Service acknowledges that the overall gray wolf population size in the Western U.S. has decreased in 2021 and 2022, primarily due to population decreases in Montana and Idaho, and that these declines are consistent with the states of Montana and Idaho's stated objectives to reduce population size in their states.

188.    The Service's not-warranted finding states that it considered whether there is any portion of the species current range for which it is true that both (1) the portion is significant, and (2) the species is in danger of extinction now or likely to become so in the foreseeable future in that portion.

189.    The Service did not consider unoccupied historical range or unoccupied suitable habitat as potentially significant portions of the species range.

190.    The Service evaluated four different potential significant portions of the gray wolf's range in the Western U.S. DPS: (1) Idaho, (2) Montana, (3) the West Coast states

(western Oregon, western Washington, and California) combined, and (4) the NRM. The Service determined that none of these portions are in danger of extinction or likely to become so in the foreseeable future.

191.    The Service's not-warranted finding concludes that Western U.S. gray wolves do not meet the definition of threatened or endangered and therefore do not warrant listing under the ESA at this time.

### FIRST CLAIM FOR RELIEF
### (Violation of the ESA – Five Threat Factors)

192.    Plaintiffs incorporate all preceding paragraphs.

193.    In evaluating whether a species qualifies for listing as a threatened or endangered species, the Service must determine whether a species is threatened by the following factors: (A) the present or threatened destruction, modification, or curtailment of the species' range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; and (E) other man-made factors affecting the species' continued existence. 16 U.S.C. § 1533(a)(1). These five threat factors are listed in the disjunctive so any one or combination of them can be sufficient for a finding that a species qualifies as threatened or endangered.

194.    The Service's not-warranted finding does not carefully analyze and evaluate these five threat factors (individually and in the aggregate) in accordance with the ESA and the Service's implementing regulations and own policies. The Service failed to carefully

evaluate and analyze the threat to gray wolves from inadequate existing regulatory mechanisms. The Service failed to carefully evaluate and analyze the threat from human-caused mortality and overutilization. The Service failed to carefully evaluate and analyze cumulative threats.

195.    The Service's not-warranted finding in the absence of undertaking a valid five-factor threats assessment is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the ESA and the APA. 5 U.S.C. § 706(2)(A).

### SECOND CLAIM FOR RELIEF
### (Violation of the ESA –Best Available Science)

196.    Plaintiffs incorporate all preceding paragraphs.

197.    Under Section 4(b)(1)(A), 16 U.S.C. § 1533 (b)(1)(A), the Service's implementing regulations, and the Service's 2011 policy on scientific integrity, the Service must make all listing determinations "solely on the basis of the best scientific and commercial data available."

198.    The Service did not rely on the best available science relating to gray wolves when reaching its not-warranted finding. The Service did not utilize the best available science on gray wolf population numbers (i.e., actual and trend, total and effective, quasi-extinction thresholds, MVPs, etc.) and the impacts of human-caused mortality. The Service misinterpreted and misapplied, and failed to consult and apply, the best available science on minimum population size, effective population size, and population estimation

methodologies. Plaintiffs provided these studies to the Service before the agency issued its not-warranted finding.

199.     The Service's decision and/or failure in its not-warranted finding to utilize the best available science on gray wolves is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the ESA and the APA. 5 U.S.C. § 706(2)(A).

**THIRD CLAIM FOR RELIEF**
**(Violation of the ESA –Significant Portion of Its Range)**

200.     Plaintiffs incorporate all preceding paragraphs.

201.     Under the ESA and the Service's implementing regulations, the Service must evaluate whether a species, subspecies, or DPS warrants listing if it is in danger of extinction or likely to become so throughout all or "a significant portion of its range." 16 U.S.C. §§ 1533(a)(1), 1532(20).

202.     The Service's not-warranted finding fails to adequately evaluate and analyze whether listing is warranted in a significant portion of the gray wolf's range in the Western U.S. The Service fails to adequately evaluate whether certain portions of the gray wolf's range in the Western U.S. are "significant." The Service fails to adequately evaluate and analyze threats to gray wolves in certain (or significant) portions of its range in the Western U.S., including in the West Coast states of Oregon, Washington, and California, as well as in Nevada, Utah, and Colorado.  The Service fails to adequately evaluate and analyze threats to gray wolves in certain (or significant) portions of its range in the Western U.S., including in the NRM. The best available science demonstrates threats to gray wolves are

concentrated in certain portions of the gray wolf's range, including in Montana and Idaho where human-caused mortality is high, and in the West Coast states and elsewhere across the Western U.S. where gray wolf populations are low or nonexistent. The Service fails to adequately evaluate and analyze the ESA's five threat factors in the portions of the species range that it purported to analyze.

203.    Gray wolves are threatened in significant portions of their range in the Western U.S.

204.    The Service's not-warranted finding in the absence of adequately evaluating "significant portion of its range" is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the ESA. 5 U.S.C. § 706(2)(A).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Court:

A.  Declare the Service has violated and continues to violate the law as alleged above;

B.  Declare that the Service's not-warranted finding that the gray wolf in the Western U.S. DPS does not meet the definition of threatened or endangered is arbitrary, capricious, an abuse of discretion, and not in accordance with the ESA;

C.  Set aside and vacate the Service's not-warranted finding;

D.  Remand this matter back to the Service with instructions to comply with the ESA, as outlined herein and by this Court;

E.  Award Plaintiffs their reasonable attorneys' fees, costs, and expenses of litigation pursuant to Section 11(g) of the ESA, 16 U.S.C. § 1540(g) and/or the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412;

F.  Issue any other relief, including preliminary or permanent injunctive relief that Plaintiffs may subsequently request; and

G.  Issue any other relief this Court deems necessary, just, or proper.


Respectfully submitted this 18th day of June, 2024.

/S/ Kelly E. Nokes
Kelly E. Nokes

/S/ Matthew K. Bishop
Matthew K. Bishop

*Counsel for Plaintiffs*